Jose Mendoza[1] *vs.* Licensing Board of Fall River
& another[2] (and a companion case).

Bristol. January 4, 2005. - May 11, 2005.

Present: Marshall, C.J., Greaney, Ireland, Spina, Cowin, Sosman, & Cordy, JJ.

*Constitutional Law,* Freedom of speech, Public entertainment. *Public Entertainment. Zoning,* Variance, Nonconforming use or structure, Validity of by-law or ordinance. *Civil Rights,* Attorney's fees. *Practice, Civil,* Attorney's fees, Costs.

This court concluded that a city's public indecency ordinance, which purported to ban all nudity in a "public place," violated the guarantee of free expression contained in art. 16 of the Massachusetts Declaration of Rights, where the ordinance was not narrowly tailored to advance the stated governmental interests (i.e., curbing crime, preserving property values, and minimizing dangers to public health), in that it completely prohibited a constitutionally protected form of expressive conduct (nude dancing) within the city limits, and where the ordinance's blanket restrictions would provide real and substantial deterrent to the right of free expression by the citizens of the city, even through other varieties of expressive nudity that would in no way give rise to the effects that the government sought to curtail. [194-202]

In the circumstances of an appeal from a decision of a city's licensing board (board) by an individual who had filed an application with the board for an adult entertainment license to present nude dancing, a Superior Court judge properly concluded that nude dancing was not a permissible use under the property's existing variance. [204-209]

In the circumstances of an appeal to Superior Court from a decision of a city's licensing board denying, based on a public indecency ordinance, the plaintiff's application to the board for an adult entertainment license to present nude dancing in his establishment, the judge did not err in awarding the plaintiff attorney's fees under 42 U.S.C. § 1988, where the plaintiff, although ultimately not obtaining the practical relief that he sought (i.e., the ability to present nude dancing at his establishment), nevertheless, by prevailing in his claim regarding the constitutionality of the ordinance, obtained relief that materially altered the legal relationship between the parties in a way that directly benefited him. [209-212]

Civil actions commenced in the Superior Court Department on July 7, 1997, and October 18, 1999, respectively.

---

[1]Doing business as Oliver's, formerly known as Bentley's Neighborhood Bar and Grill.

[2]The city of Fall River.

Motions for partial summary judgment were heard by *John A. Tierney*, J., and *Vieri Volterra*, J., and the cases were tried before *Robert J. Kane*, J.

The Supreme Judicial Court on its own initiative transferred the case from the Appeals Court.

*Thomas Lesser* for the plaintiff.

*Thomas F. McGuire, Jr.*, for the defendants.

*Sarah R. Wunsch, James L. Quarles, III, & Steven P. Lehotsky* for American Civil Liberties Union of Massachusetts, amicus curiae, submitted a brief.

CORDY, J. For eight years, Jose Mendoza, the proprietor of Oliver's, a bar and entertainment venue in Fall River, has sought to stage nude dancing. Through its elected and appointed officials, the city of Fall River (city or Fall River) has attempted to prevent Mendoza from doing so, repeatedly denying his application for an adult entertainment license and passing various restrictive ordinances. The dispute eventually resulted in litigation. After a series of judgments in the Superior Court, both parties appealed. The city appeals from judgments that its public indecency ordinance (indecency ordinance),[3] which purports to ban all public nudity, violates art. 16 of the Massachusetts Declaration of Rights, as amended by art. 77 of the Amendments to the Massachusetts Constitution ("The right of free speech shall not be abridged"), and that Mendoza is entitled to a portion of his attorney's fees and costs as a "prevailing party" under 42 U.S.C. § 1988 (2000). Mendoza appeals from a judgment that, given the scope of Oliver's current zoning variance, he must obtain a new variance in order to offer nude dancing there.

Consistent with our prior decisions interpreting art. 16, we conclude that the city's indecency ordinance violates the guarantee of free expression contained therein, and affirm the judgment declaring the ordinance unconstitutional. We also affirm the judgment that nude dancing is not a permissible use under the property's current variance. Finally, we affirm the award to Mendoza of his attorney's fees.

1. *Background.* This case arises from protracted licensing proceedings and litigation between Mendoza and the city that

---

[3]Section 46-12 of the Revised Ordinances of Fall River (1999).

we detail below. Since 1983, Oliver's has operated as a restaurant and bar at its present location, adjacent to an airport in the Fall River Industrial Park.[4] Oliver's has held a live entertainment license since 1985 and has hosted various types of entertainment and music for its patrons, including rock and roll concerts for up to 400 people. In 1996, the airport closed, and the owner of the Oliver's parcel, Cathleen Viveiros, received a zoning variance from the zoning board of appeals of Fall River (board of appeals) to continue operating the establishment.[5] We reserve discussion of the circumstances surrounding the granting of this variance for the section of the opinion that addresses its scope.

In 1997, Mendoza, the operator of Oliver's who leased the property from Viveiros, filed an application with the licensing board of Fall River (licensing board) for an adult entertainment license to present nude dancing. After a public hearing, the licensing board denied the application as premature, finding that adult entertainment was not within the scope of the property's 1996 zoning variance.[6] Within two months of the denial, the city enacted an amendment to its zoning ordinance to provide for an adult entertainment special permit procedure and an adult

[4]For some periods of time, the establishment was also known as Bentley's Neighborhood Bar and Grill and Oliver's Billiards. We will refer to it solely as Oliver's.

[5]Prior to 1996, Oliver's had operated as an "accessory use" to the airport. Because Fall River's zoning ordinance does not otherwise permit restaurants or entertainment venues in the Fall River Industrial Park, Cathleen Viveiros sought a variance to ensure that Oliver's could continue to operate lawfully after the airport closed.

[6]At the hearing, which took place on April 14, 1997, Mendoza's counsel addressed the licensing board and expressed the opinion that Oliver's existing entertainment license permitted the establishment to present nude dancing but that Mendoza's application was an attempt to clarify the status of Oliver's entertainment license. An attorney representing the city presented a legal opinion that Mendoza lacked a license for nude dancing and that the 1996 variance for the property would preclude such a use without an additional variance from the board of appeals, and played the tape recording of the 1996 meeting, during which the board of appeals granted the variance. In addition, the city's attorney submitted to the licensing board summaries of studies that analyzed the secondary effects of adult entertainment on certain cities. Members of the general public also addressed the licensing board, opposing Mendoza's application. One individual presented a petition with more than 5,000 signatures opposing the application.

entertainment overlay district, confining such uses to an area located outside the Fall River Industrial Park. Subsequently, Mendoza filed a lawsuit against the city and the licensing board challenging the denial of his license application, the validity of the licensing board's process for issuing adult entertainment licenses, and the validity of the zoning ordinance amendment and overlay district.

In 1999, Mendoza filed a second application with the licensing board, seeking to expand the scope of Oliver's existing entertainment license to include nude dancing. After a public hearing, the licensing board denied the application on its merits, finding that Mendoza had failed to establish that the license he sought would not adversely affect the public's health, safety, or order as required by G. L. c. 140, § 183A.[7] In response, Mendoza filed a second lawsuit against the city and the licensing

[7] In relevant part, G. L. c. 140, § 183A, provides:

"No inn holder, common victualler, keeper of a tavern, or person owning, managing, or controlling any club, restaurant or other establishment . . . shall, as a part of its usual business, offer to view, set up, set on foot, maintain or carry on a concert, dance exhibition, cabaret or public show of any description, unless and until a license therefor has been issued by the licensing authorities. . . . *The licensing authorities shall grant a license under this section unless they find that the license, taken alone or in combination with other licensed activities on the premises, would adversely affect the public health, safety or order*, in that the concert, dance, exhibition, cabaret, or public show cannot be conducted in a manner so as to: (*a*) protect employees, patrons, and members of the public inside or outside the premises from disruptive conduct, from criminal activity, or from health, safety or fire hazards; (*b*) prevent an unreasonable increase in the level of noise in the area caused by the licensed activity or caused by patrons entering or leaving the premises; or (*c*) prevent an unreasonable increase in the level of pedestrian or vehicular traffic in the area of the premises or an unreasonable increase in the number of vehicles to be parked in the area of the premises." (Emphasis added.)

On an application for an entertainment license, the statute requires the applicant to state "whether as part of the concert, dance exhibition, cabaret or public show any person will be permitted to appear on the premises in any manner or attire as to expose to public view any portion of the pubic area, anus, or genitals, or any simulation thereof, or whether any female person will be permitted to appear on the premises in any manner or attire as to expose to public view any portion of the breast below the top of the areola, or any simulation thereof." *Id.*

board in the form of a petition for certiorari, challenging the denial of the license, the 1997 zoning ordinance and overlay district, and the procedure for obtaining an adult entertainment license. On June 28, 2000, a judge in the Superior Court entered partial summary judgment for Mendoza, holding that the licensing board had improperly shifted the burden of proof under G. L. c. 140, § 183A, to him, and that a license must issue unless the licensing board meets its burden of justifying the denial by enumerating the factors it considered and providing a reasoned basis for the result. The judge then remanded the case to the licensing board for further proceedings.

On remand, the licensing board again denied Mendoza's application. Several days before the licensing board issued its written denial, the city enacted a public indecency ordinance, which, inter alia, banned public nudity in Fall River. The city also enacted a related amendment to its zoning ordinance, making changes to the adult entertainment overlay district, deleting nude dancing as a permissible use in such a district, and revising the adult entertainment special permit process. The new district again did not include any part of the Fall River Industrial Park.

In December, 2000, Mendoza amended the complaint in his second lawsuit to challenge the latest denial of his application by the licensing board and to assert State and Federal constitutional challenges to the city's new ordinances related to public indecency and adult entertainment. On January 2, 2001, the judge ruled on further motions for summary judgment filed by the parties, concluding that the licensing board failed to meet its burden under G. L. c. 140, § 183A, to justify its denial of the license. In particular, the judge rejected the licensing board's reliance on studies of the secondary effects of adult entertainment in locations outside of Massachusetts, finding that those studies "do not provide enough information with which to rationally reach a conclusion regarding the specific business involved in the instant case." He further found that Mendoza was in compliance with G. L. c. 140, § 183A, and entered an order requiring the licensing board to issue the adult entertainment license, retroactively effective to September 1, 1999, the date of the first denial of

Mendoza's 1999 application.[8] As ordered by the judge, the licensing board issued an adult entertainment license to Oliver's on January 10, 2001, but conditioned it on the establishment's adherence to the public indecency ordinance banning all public nudity.

To avoid the enforcement of the indecency ordinance, Mendoza obtained a preliminary injunction against the city from a second judge, premised on Mendoza's likely success on the merits of his constitutional challenge to it. On April 2, 2001, Oliver's began presenting nude dancing. The city sought review before a single justice of the Appeals Court, who vacated the preliminary injunction on April 30, 2001. After a month of performances, nude dancing at Oliver's ended.

Mendoza's first and second lawsuits were thereafter consolidated, and Mendoza filed four motions for partial summary judgment separately challenging the constitutionality of the indecency ordinance, the overlay district ordinance, the special permit ordinance, and the licensing board's and the city's actions in 1997. The city and licensing board filed a cross motion for summary judgment on all claims. A third judge granted Mendoza's motions in part, issuing a declaratory judgment that the indecency ordinance, while not violative of the First Amendment to the United States Constitution, was unconstitutional under art. 16. The city appealed from this judgment. The judge's rulings on Mendoza's other motions were not appealed from by either party.[9]

On September 11, 2002, a bench trial on Mendoza's remaining claims was held in the Superior Court before a fourth judge, who found that Oliver's original 1996 zoning variance did not permit adult entertainment and that Mendoza would have to obtain an additional zoning variance to present nude dancing at Oliver's.

---

[8]Although the city asked the judge to reach Mendoza's constitutional claims, the judge denied that request as premature because genuine issues of material fact remained in dispute.

[9]Those rulings included an order overturning the denial of Mendoza's application on zoning grounds in 1997 and requiring the licensing board to issue an adult entertainment license for Oliver's retroactively effective to May 9, 1997, the date the licensing board refused to act on the merits of the 1997 application.

Mendoza appealed.[10] The judge also issued declaratory judgments invalidating the adult entertainment overlay district and special permit process on State and Federal constitutional grounds. The city has not appealed from these judgments.

In his decision, the judge invited requests for the award of attorney's fees and costs. After considering the parties' submissions, the judge determined that Mendoza was the "prevailing party" in the litigation and thus entitled to attorney's fees and costs related to his successful Federal constitutional claims under 42 U.S.C. § 1988, but not entitled to those fees and costs related to his State constitutional claims. The city and licensing board appeal from the legal conclusion underlying the award that Mendoza was the "prevailing party." We transferred the parties' appeals from the Appeals Court on our own motion.

2. *Constitutionality of the public indecency ordinance under art. 16.* Enacted in November, 2000, during a flurry of legislative activity directed at restricting adult entertainment in the city, the indecency ordinance makes it a "summary offense" knowingly or intentionally to "appear[] in a state of nudity" in a "public place." The indecency ordinance defines "[n]udity" as:

> "[T]he showing of the human male or female genitals, pubic hair or buttocks with less than a fully opaque covering; the showing of the female breast with less than a fully opaque covering of any part of the nipple; the exposure of any device, costume, or covering which gives the appearance of or simulates the genitals, pubic hair, natal cleft, perineum anal region or pubic hair region; or the exposure of any device worn as a cover over the nipples and/or areola of the female breast, which device simulates and gives the realistic appearance of nipples and/or areola."

It applies in any "public place," including "places of entertainment, taverns, restaurants, clubs, theaters, dance halls, banquet

---

[10]Mendoza also filed a posttrial motion to alter and amend the findings, urging the judge to change aspects of his findings related to the zoning issue. That motion was denied. Although his notice of appeal includes an appeal from this denial, Mendoza did not brief this aspect of his appeal, and it is therefore waived. Mass. R. A. P. 16 (a) (4), as amended, 367 Mass. 921 (1975).

halls, party rooms or halls limited to specific members, restricted to adults or to patrons invited to attend." It does not apply to children under ten years of age or to women breastfeeding infants under two years of age.

The indecency ordinance includes a statement of legislative purpose:

> "It is the purpose and intent of this section to address and mitigate the deleterious secondary effects of public nudity, since such secondary effects have been found as a result of numerous studies, and after other public input, to include increased crime, adverse impacts on public health, adverse impacts on the business climate of the city, adverse impacts on the property values of residential and commercial properties, and adverse impacts on the quality of life in the city, all of which secondary impacts are adverse to the health, safety, and general welfare of the city and its inhabitants. The provisions of this section are written in light of the United States Supreme Court's ruling in *City of Erie, et al.* V. *Pap's A.M. tdba 'Kandyland,'* [529 U.S. 277] (2000). The provisions of this section have neither the purpose nor the intent of imposing a limitation or restriction on anyone's constitutional rights, but merely seek to address the deleterious secondary effects that stem from the conduct described here."

As drafted, it is virtually identical to the ordinance upheld by the United States Supreme Court in *Erie* v. *Pap's A.M.*, 529 U.S. 277 (2000) (*Erie*). In that case, which generated no majority opinion, the Court concluded that the Erie, Pennsylvania, ordinance did not violate an adult entertainment business owner's right of free expression under the First Amendment and Fourteenth Amendment to the United States Constitution because it was a valid content-neutral regulation of conduct justified by the city's legitimate interest in preventing the harmful secondary effects of adult entertainment establishments. *Id.* at 296-302 (opinion of O'Connor, J.).

In rejecting Mendoza's Federal constitutional challenge to the ordinance here, the judge concluded that *Erie* foreclosed any facial challenge to the ordinance under the United States

Constitution.[11] He then proceeded to analyze the ordinance under art. 16 and ruled that art. 16 is more protective of nude dancing than the First Amendment. Declaring the ordinance unconstitutional, the judge found that (1) the ordinance was a content-based restriction on speech that was not precisely drawn to serve a compelling State interest; (2) even if the ordinance were content neutral, it would nevertheless be unconstitutional because it was not narrowly tailored to serve a significant government interest and failed to provide ample alternative channels of communication; and (3) the ordinance was unconstitutionally overbroad in that it punished expressive conduct with no connection to the alleged secondary effects of public nudity. In its appeal from this judgment, the city challenges each of the judge's three grounds for invalidating the ordinance, urging us to adopt the controlling First Amendment analysis of the ordinance under *Erie* for the purposes of art. 16. The city's appeal thus requires us to decide whether the ordinance is constitutional under art. 16.

As a threshold matter, it is beyond debate that nude dancing enjoys constitutional protection as a form of expression. *Cabaret Enters., Inc.* v. *Alcoholic Beverages Control Comm'n*, 393 Mass. 13, 15-17 (1984) (*Cabaret Enters.*). *Commonwealth* v. *Sees*, 374 Mass. 532, 537-538 (1978). See *Miller* v. *South Bend*, 904 F.2d 1081, 1089-1104 (7th Cir. 1990) (Posner, J., concurring), rev'd sub nom. *Barnes* v. *Glen Theatre, Inc.*, 501 U.S. 560 (1991) (describing why nude and erotic dancing qualify as "expression" with references to historical and cultural sources). Although the Supreme Court has said that nude dancing is "expressive conduct within the outer perimeters of the First Amendment, though . . . only marginally so," *Barnes* v. *Glen Theatre, Inc.*, *supra* at 566 (opinion of Rehnquist, C.J.), this court has rejected such qualification under art. 16. *Cabaret Enters.*, *supra* at 16-17, citing *Commonwealth* v. *Sees*, *supra* at 537-538 ("For the purpose of assessing the amount of protection to which nude dancing is constitutionally entitled, we declined in *Sees* to distinguish between barroom-type nude dancing and performances of greater artistic or socially redeeming significance"). The ordinance bans all public nudity, includ-

---

[11]Mendoza has not appealed this aspect of the judge's ruling.

ing constitutionally protected nude dancing, the entertainment Mendoza seeks to present at Oliver's.

a. *Level of scrutiny.* We turn first to the level of scrutiny to be applied. Relying on the reasoning of the plurality opinion in *Erie, supra* at 289-296, the city urges us to find that the ordinance is content neutral and subject to the more permissive "intermediate" standard of review for the regulation of expressive conduct set forth in *United States* v. *O'Brien,* 391 U.S. 367, 376-377 (1968). See *Ward* v. *Rock Against Racism,* 491 U.S. 781, 791 (1989); *Clark* v. *Community for Creative Non-Violence,* 468 U.S. 288, 293 (1984); *Opinion of the Justices,* 430 Mass. 1205, 1209 (2000); *Boston* v. *Back Bay Cultural Ass'n,* 418 Mass. 175, 179 (1994). Mendoza, on the other hand, defends the judge's finding that the ordinance is content based because its language and the timing of its enactment unquestionably confirm that its purpose was to restrain nude dancing at Oliver's, and therefore a "strict scrutiny" standard should be applied. See *Erie, supra* at 328-332 (Stevens, J., dissenting); *Barnes* v. *Glen Theatre, Inc., supra* at 592-594 (White, J., dissenting).

We need not, however, decide whether the ordinance is content based or content neutral because whether we apply a strict scrutiny or an intermediate scrutiny standard of review, the ordinance fails the test of art. 16. See *T & D Video, Inc.* v. *Revere,* 423 Mass. 577, 581 (1996).

b. *Intermediate scrutiny of the ordinance under art. 16.* For a content-neutral restriction of expressive conduct to pass constitutional muster, it must (1) "further[] an important or substantial governmental interest . . . unrelated to the suppression of free expression," and (2) it must do so by means "no greater than is essential to the furtherance of that interest." *United States* v. *O'Brien, supra* at 377.[12] This form of scrutiny is the same as is applied to content-neutral "time, place, and

---

[12]The standard of scrutiny applied to a content-based restriction on expressive conduct is whether the government can demonstrate that the restriction is "necessary to serve a compelling state interest and that it is narrowly drawn to achieve that end." *Benefit* v. *Cambridge,* 424 Mass. 918, 925 (1997), quoting *Perry Educ. Ass'n* v. *Perry Local Educators' Ass'n,* 460 U.S. 37, 45 (1983). See *R.A.V.* v. *St. Paul,* 505 U.S. 377, 382 (1992) ("Content-based regulations are presumptively invalid").

manner" regulations. See *T & D Video, Inc.* v. *Revere, supra*; *Boston* v. *Back Bay Cultural Ass'n, supra* at 182; *Ward* v. *Rock Against Racism, supra.* In other words, the regulation must be "narrowly tailored" to advance the government interest "without at the same time banning or significantly restricting a substantial quantity of speech that does not create the . . . evils [the city seeks to eliminate]." *Boston* v. *Back Bay Cultural Ass'n, supra* at 182, quoting *Ward* v. *Rock Against Racism, supra* at 799 n.7. A regulation will not satisfy this requirement if it "unreasonably limit[s] alternative avenues of communication." *T & D Video, Inc.* v. *Revere, supra* at 581, quoting *Renton* v. *Playtime Theatres, Inc.*, 475 U.S. 41, 47 (1986).

In prior cases in which we have had occasion to review ordinances restricting nudity in establishments licensed for the sale of alcohol, it was not necessary for us to apply the "narrowly tailored" prong of intermediate scrutiny. See *Cabaret Enters., supra* at 17; *Commonwealth* v. *Sees, supra* at 537. The records in both cases "failed to demonstrate [any] justification for the imposition of a restraint on the exercise of a right guaranteed by art. 16." *Cabaret Enters., supra.* See *T & D Video, Inc.* v. *Revere, supra* at 581 ("Revere made no attempt to justify its . . . [o]rdinances by reference to the secondary effects of sexually oriented businesses . . . . The legislative record is barren"). Here, on the other hand, the city has at least advanced and attempted to document a governmental interest in banning public nudity.[13]

Notwithstanding any other motivations, the city's stated intentions — of curbing crime, including prostitution and rape,

[13]We note that the studies (from other jurisdictions) supporting the city's stated purpose of curbing the "secondary effects of public nudity" do not support the conclusion that "public nudity" in general has any "secondary effect"; rather, the studies uniformly document the secondary effects of "sexually oriented businesses," not nudity per se. That the evidence marshaled by the city in support of its stated rationale to combat "secondary effects" of the proscribed conduct singles out establishments like Mendoza's and not other forms of public nudity seems a strong indicator that the ordinance is directed at the form of nudity common in adult entertainment. See Bryant Paul, Government Regulation of "Adult" Businesses Through Zoning and Anti-Nudity Ordinances: Debunking the Legal Myth of Negative Secondary Effects, 6 Comm. L. & Pol'y 355, 389 (2001).

preserving property values, and minimizing dangers to public health — are without doubt substantial government interests. The ordinance in this case, however, completely prohibits a constitutionally protected form of expressive conduct within the city limits. It not only "unreasonably limits alternative avenues of communication," it eliminates all avenues for Mendoza or any other citizen of the city to present nude dancing in the city. See *A.F.M., Ltd.* v. *Medford,* 428 Mass. 1020, 1021 (1999) (upholding adult bookstore's preliminary injunction against adult entertainment zoning ordinance because "city was obligated, as a practical matter, to ensure that its regulatory scheme did not unreasonably foreclose avenues for communication of the material the plaintiff intended to sell"). As such the ordinance is tantamount to censorship of such protected expression. No matter what the formulation of the test, such a complete ban is not "narrowly tailored," and is unconstitutional on that ground.

In so ruling, we reject the city's argument that erotic dancers, clad in the oft-cited sartorial combination of "pasties and G-strings," may nevertheless express an equivalent "message" without dropping "the last stitch." *Erie, supra* at 294 (opinion of O'Connor, J.). The "nudity of the dancer is an integral part of the emotions and thoughts that a nude dancing performance evokes. . . . The sight of a fully clothed, or even a partially clothed, dancer generally will have a far different impact on a spectator than that of a nude dancer, even if the same dance is performed. The nudity is itself an expressive component of the dance . . . ." *Barnes* v. *Glen Theatre, Inc., supra* at 592 (White, J., dissenting). In *Commonwealth* v. *Sees, supra,* we recognized the constitutionally protected expressive nature of nude dancing under art. 16 and reaffirmed it in *Cabaret Enters.* Nothing in *Erie* persuades us to change our view.

c. *Overbreadth under art. 16.* The overbreadth of the ordinance drives an alternative fatal stake into its heart. While our preceding scrutiny of the ordinance under art. 16 analyzed its application to Mendoza's attempts to offer nude dancing in an establishment licensed for adult entertainment, our overbreadth analysis tests the constitutionality of the ordinance by examining its "potential application" to the expression of others. *Commonwealth* v. *A Juvenile,* 368 Mass. 580, 585 (1975).

A "clear and precise enactment may . . . be 'overbroad' if in its reach it prohibits constitutionally protected conduct." *Planned Parenthood League of Mass., Inc.* v. *Operation Rescue*, 406 Mass. 701, 715 (1990), quoting *Grayned* v. *Rockford*, 408 U.S. 104, 114 (1972). "[W]here conduct and not merely speech is involved . . . the overbreadth of a statute must not only be real, but substantial as well, judged in relation to the statute's plainly legitimate sweep." *Commonwealth* v. *Oakes*, 401 Mass. 602, 605 (1988), vacated and remanded, 491 U.S. 576 (1989), quoting *Broadrick* v. *Oklahoma*, 413 U.S. 601, 615 (1973).[14]

The ordinance's sweep unapologetically includes "work[s] of unquestionable artistic and socially redeeming significance," like the rock musical "Hair," the play "Equus," and Richard Strauss's opera "Salome" and Oscar Wilde's play of the same name.[15] *Commonwealth* v. *Sees, supra* at 537. See *Erie, supra* at 326 (Stevens, J., dissenting); *Doran* v. *Salem Inn, Inc.*, 422 U.S. 922, 933 (1975); *Miller* v. *South Bend*, 904 F.2d 1081, 1089-1104 (7th Cir. 1990) (Posner, J., concurring). Cf. *Southeastern Promotions, Ltd.* v. *Conrad*, 420 U.S. 546, 557-558 (1975); *Farkas* v. *Miller*, 151 F.3d 900, 905 (8th Cir. 1998). Despite the wide range of nonexpressive nudity prohibited by the ordinance (including nude sunbathing, indecent exposure, obscenity, and the imposition of nudity on an unwilling or unsuspecting person, see *Cabaret Enters., supra* at 17), its blanket restrictions would provide "real and substantial deterrent" to the exercise of the right of free expression by the citizens of Fall River, *Commonwealth* v. *Bohmer*, 374 Mass. 368, 374 (1978), even through varieties of expressive nudity that in no way give rise to the

---

[14]Even if the ordinance constitutionally applied to the nude dancing performances proposed for Oliver's, Mendoza may assert the rights of others in challenging the restriction "where the [restriction] challenged is incapable of being construed so as to limit its application to unprotected activity, and where it presents a real and substantial deterrent to protected expression." *Commonwealth* v. *Bohmer*, 374 Mass. 368, 374 (1978), citing *Young* v. *American Mini Theatres, Inc.*, 427 U.S. 50, 60 (1976). See *Doran* v. *Salem Inn, Inc.*, 422 U.S. 922, 933 (1975).

[15]We make this observation with no intention of implying that the city would have been wiser to ban only public nudity without such cultural significance; because art. 16 makes no distinction between "free speech in a bar and free speech on a stage," such a ban would no more pass constitutional muster than the ordinance before us. *Commonwealth* v. *Sees*, 374 Mass. 532, 537 (1978).

"secondary effects" it seeks to curtail. In enacting a ban of nudity even more extensive than the barroom antinudity ordinances invalidated by this court in *Sees* and *Cabaret Enters.*, the city has traveled in the constitutionally unacceptable direction of banning even more protected expression.

d. *Art. 16 and the First Amendment.* In holding that the ordinance violates art. 16, we recognize that our analysis departs from the Supreme Court's treatment of similar ordinances under the First Amendment. *Erie, supra. Barnes* v. *Glen Theatre, Inc.,* 501 U.S. 560 (1991). Neither party disputes, however, that art. 16 may provide greater protection for nude dancing than the First Amendment. *Commonwealth* v. *Sees, supra* at 537-538. Cf. *Lyons* v. *Globe Newspaper Co.*, 415 Mass. 258, 268-269 (1993) ("independent protections of freedom of speech which are found in . . . art. 16 would lead us to reach the same result even if there existed no Federal constitutional support for the principles which we applied"). We adhere to the principle that this court will exercise its independent judgment to uphold the cherished protections of the Declaration of Rights as a matter of State constitutional law. See, e.g., *Commonwealth* v. *Gonsalves,* 429 Mass. 658, 668 (1999); *Planned Parenthood League of Mass., Inc.* v. *Attorney Gen.,* 424 Mass. 586, 590 (1997); *Commonwealth* v. *Upton,* 394 Mass. 363, 373 (1985); *Batchelder* v. *Allied Stores Int'l, Inc.,* 388 Mass. 83, 87-89 (1983); *Moe* v. *Secretary of Admin. & Fin.,* 382 Mass. 629, 651 (1981).

Although the analysis under art. 16 is generally the same as under the First Amendment, see *Opinion of the Justices,* 430 Mass. 1205, 1209 n.3 (2000), and cases cited, we leave open the possibility that, as here, art. 16 will call for a different result. In our weighing the ordinance in this case and the Supreme Court's reasoning in upholding a similar ordinance, we conclude that the Federal rule does not adequately protect the rights of the citizens of Massachusetts under art. 16. See *Commonwealth* v. *Mavredakis,* 430 Mass. 848, 858 (2000). Not surprisingly, other State Supreme Courts have come to the same conclusion. See *Pap's A.M.* v. *Erie,* 571 Pa. 375, 394 (2002) (on remand from United States Supreme Court, Supreme Court of Pennsylvania held Erie ordinance invalid on State constitutional grounds). See also *Mickens* v. *Kodiak,* 640 P.2d 818, 821-

823 (Alaska 1982) (citing *Commonwealth* v. *Sees, supra,* court held ordinance prohibiting nude performances violates State Constitution even if not First Amendment); *Bellanca* v. *New York State Liquor Auth.,* 54 N.Y.2d 228, 234-236 (1981), cert. denied, 456 U.S. 1006 (1982) (on remand from United States Supreme Court, court held complete ban on topless dancing in establishments serving alcohol invalid on State constitutional grounds).

For these reasons, we hold that the ordinance is unconstitutional under art. 16 and affirm the declaratory judgment.

3. *Scope of Mendoza's variance.* In 1996, following the closure of the airport in the Fall River Industrial Park, counsel representing the previous owner of Oliver's, Cathleen Viveiros, appeared before the board of appeals and obtained a zoning variance for the property.[16] See G. L. c. 40A, § 10. The petition for the variance requested the right to "operate a restaurant, lounge, bar, function facility, theatre, hall, or other place of amusement, entertainment or assembly in an industrial park district."

The petition explained the hardship that would be faced if a variance was not granted:

> "Building Permit for requested use was initially granted for premises as an accessory and incidental use to an airport in 1981. With close of airport, owner wishes to insure [*sic*] that existing facility is properly zoned for continued operation and for the purposes of insuring [*sic*] marketability and possible refinancing. Existing premises were designed and built for requested use and have no other economic use."

The petition also stated that the proposed use would not be detrimental to the neighborhood because the "[p]remises have been used for requested purposes since 1981 without objection" and would not "derogate from the intent and purpose of the zoning ordinance" because the "[f]acility has provided ameni-

---

[16]It appears that, whether in 1981 or in 1996, the owner of Oliver's should have sought a special permit from the board of appeals pursuant to the city's zoning ordinance's provision for public accommodations uses within industrial park districts. That owner's failure to do so, however, has no effect on Mendoza's rights under the existing variance.

ties to adjoining airport and industrial park since 1981 as an accessory use." Additionally, it stated that "[t]here are no residential or commercial facilities in the vicinity that would be affected or have been affected by the actual and proposed use."[17]

At the public hearing on the variance, counsel for Viveiros represented that she was seeking a variance to satisfy the request of a financing institution to establish that the existing use remained legal after the airport closure. According to the transcript of the proceedings, counsel said, "There is no contemplated additions or changes to the structure. It's just to continue the existing use to satisfy the powers that be as far as use of the land is concerned. That's the purpose of this petition."[18] After no objection was made, the board of appeals unanimously approved the petition without discussion.

The variance decision, recorded at the registry of deeds, provides, in relevant part:

> "In the matter of the petition of Cathleen Viveiros for permission to operate a restaurant, lounge, bar, function facility, theater, hall or other place of amusement, entertainment or assembly waiving use and dimensional requirements in an Industrial Park District [IP]. Lot size 216,921 s.f. In a vote of 5-0 the Board unanimously granted the petitioners request. . . . *The Board found that the existing business has been operating at this site for over twelve years and the petitioner would like to continue the same. The Board determined that since there will be no changes to the existing building or use of the building it would be an avoidable hardship to deny this petition.* The proposed use serves many of the businesses in the Industrial Park and is not a detriment to the area, nor does the use derogate from the intent and purpose of the zoning ordinance." (Emphasis added.)

---

[17]The petition also noted: "The proposed use is permitted in business districts. Sec. 21-121(1)(f)." Section 21-121(1) of the city's zoning ordinance in effect in 1996 specifies allowed uses in a business district, including "[h]otel, restaurant or other eating place," and "[c]lub, or other organization, dance hall, theatre, hall or other place of amusement or assembly."

[18]Counsel began his remarks before the board of appeals by saying, "This looks more threatening perhaps, than it really is. This is a question of lawyers making work for lawyers."

Noting Viveiros's representations to the board of appeals that the use of the property would not change,[19] the trial judge held that the variance did not authorize Mendoza to offer nude dancing at Oliver's. Specifically, the judge rejected Mendoza's argument that his intention to offer adult entertainment constituted a protected intended use of the property within the scope of the zoning variance when Mendoza first applied for an adult entertainment license in 1997. The judge found that notwithstanding zoning ordinance amendments enacted after the effective date of Mendoza's adult entertainment license, Mendoza's 1996 variance never permitted the presentation of nude dancing at Oliver's. Mendoza appeals from this aspect of the trial judge's decision.[20]

Mendoza argues that, on the effective date of his adult entertainment license, nude dancing was an allowed use as of right in three of the city's business districts. And, given that the language in Oliver's variance was broader than the language describing the allowed uses in the city's business districts, that variance, which contains no express condition, should be read to allow nude dancing as well. Mendoza also faults the trial judge for placing special emphasis on the representations of Viveiros and her counsel in proceedings before the board of appeals, arguing that the inquiry should look solely to the face of the decision (as recorded at the registry of deeds) and that such representations cannot bind property owners.

In defense of the judge's ruling, the city and licensing board

[19]The judge noted, "Oliver's cannot gainsay that the Board of Appeals never authorized Oliver's use as an adult entertainment club. Patently, the Board of Appeals confined the variance to continuation of Oliver's existing business which had been operating in the industrial district for twelve years."

[20]The trial judge made this ruling in the context of rejecting Mendoza's argument that he need not reach the question of the constitutionality of the adult entertainment zoning ordinance enacted after the first denial of Mendoza's application for an adult entertainment license. This leaves the judge's ruling on the scope of the variance in a peculiar posture, as the judge next invalidated the city's adult entertainment overlay district and special permit process. We thus review the judge's legal analysis de novo, with the recognition that this case does not involve any party's specific challenge or defense of the variance itself. As the trial judge noted in the introduction to his decision, "original jurisdiction resides in the City to determine whether nude dancing at Oliver's within the industrial district conforms with G. L. c. 40A and the zoning ordinance of the City."

argue that the scope of the variance should be strictly construed to exclude nude dancing, given the board's express finding that the use of the property would not change. The variance itself and the transcript of the proceedings reveal that the board of appeals never evaluated whether a variance for a new adult entertainment use should be granted.

First, we fail to discern the legal basis for relying on the representations of the owner of the property and her counsel in the variance petition and at the public hearing in 1996. Purchasers of property or their attorneys are not expected or required to look behind the face of recorded variance decisions to ascertain their effective scope, unless those decisions expressly incorporate other plans or records by reference. See *DiGiovanni* v. *Board of Appeals of Rockport*, 19 Mass. App. Ct. 339, 346-347 (1985) (requiring strict adherence to original plans referenced in variance); Healy, Procedure for Obtaining Variances and Special Permits, 1 Massachusetts Zoning Manual § 10.14.5(f), at 10-48 (Mass. Continuing Legal Educ. 1999 & Supp. 2002) ("Conditions that do not appear on the face of a recorded decision should not . . . be held to bind a mortgagee or purchaser who acquires an interest in the affected property without notice or knowledge of the error"). This principle is consistent with the Zoning Enabling Act's command that permit granting authorities must make specific and detailed findings that analyze the statutory requirements when granting variances. G. L. c. 40A, § 10. See *Warren* v. *Zoning Bd. of Appeals of Amherst*, 383 Mass. 1, 10 (1981).

On the other hand, the face of the variance in this case admits considerable ambiguity. In favor of Mendoza's interpretation are the variance's extensive list of permitted uses: "a restaurant, lounge, bar, function facility, theater, hall or other place of amusement, entertainment or assembly." This list contemplates a wide range of public accommodations, without explicit limitation. In the city's favor, the paragraph describing the board's findings indicates that the variance should be far narrower: "The Board determined that since there will be no changes to the existing building or use of the building it would

be an avoidable hardship to deny this petition."[21] In essence, the legal foundation for the board's decision rests directly on the express finding that Oliver's existing use will not be changed, and the finding could thus be read as a binding condition on the variance, despite not being denominated as such.

In these circumstances, we agree with the judge that the best interpretation of the variance reads the board's finding as a limiting condition on the use of the property.[22] Within the stringent statutory requirements of the Zoning Enabling Act, variances are not allowed as a matter of right, and should be "sparingly granted." *Barron Chevrolet, Inc.* v. *Danvers*, 419 Mass. 404, 408 (1995), quoting *Mendes* v. *Board of Appeals of Barnstable*, 28 Mass. App. Ct. 527, 531 (1990). Where there is ambiguity on the face of a variance decision, it should be resolved against the holder of the variance. See *DiGiovanni* v. *Board of Appeals of Rockport, supra* at 347 ("language of a variance is to be construed against the individual requesting the variance, rather than against the granting authority").

Given the effect of the variance's limitation, we turn to the question whether nude dancing might constitute an existing use within the terms of the variance. The judge found that even if the property's existing uses were unrelated to any variance and, instead, were prior nonconforming uses, the introduction of adult entertainment in the form of nude dancing would constitute an impermissible "change or substantial extension" of such prior use. In reaching this conclusion, the judge relied on

[21]The variance decision does not track the statute's criteria for granting a variance, which, inter alia, require the petitioner to face a "substantial hardship" if the petition is denied. G. L. c. 40A, § 10. The validity of the variance, however, is not before us.

[22]We acknowledge that this variance raises potentially problematic issues of notice, particularly because the decision does not specify the property's existing use; this omission might pose difficulty for a subsequent purchaser without notice of the existing use. Notice, however, is not an issue in this case. Although the ownership of the Oliver's property is not clear from the record, Mendoza's 1997 complaint, amended in 1999, states that Mendoza, doing business as Oliver's, "has held a seven day liquor license for the premises continuously since 1983," "has held an entertainment license for the premises continuously since 1994," and, as of 1999, "occupie[d] the premises under a written lease." As the longtime operator of Oliver's and the proponent of nude dancing at the property throughout the proceedings in this case, Mendoza had actual notice of the property's existing use.

(1) the licensing board's separate categorization of adult entertainment on applications for entertainment licenses pursuant to G. L. c. 140, § 183A; (2) the Zoning Enabling Act's authorization of special permits specifically for adult entertainment, G. L. c. 40A, § 9 (*a*); (3) the common notion that adult entertainment is a discrete medium of entertainment with special properties; and (4) the "adverse impacts" of adult entertainment on other industrial park users.

Pointing to the establishment's distance from residences and its history of offering well-attended rock and roll shows, Mendoza challenges the judge's reliance on the alleged impacts of nude dancing in the Fall River Industrial Park. Mendoza also argues that adult entertainment is a subset of entertainment, within the broad scope of the "entertainment" use once allowed as an accessory use to the airport and now through the variance decision. In response, the city advances studies analyzing the harmful secondary effects of adult entertainment to support the trial judge's finding that nude dancing constitutes a new use not within the scope of the variance.

Although we understand the judge's rationale for analogizing Oliver's proposed use of nude dancing to the modification of a prior nonconforming use, and applying the test for such a modification to determine whether it would constitute a "change or substantial extension of such use," G. L. c. 40A, § 6; see *Bridgewater* v. *Chuckran*, 351 Mass. 20, 23 (1966), even that test may be too generous to Mendoza. Unlike prior nonconforming uses, which originated as legal uses of property, uses within a variance only become legal with the permission of the permit granting authority. See *Barron Chevrolet, Inc.* v. *Danvers*, *supra* at 408. Variances allowing nonconforming uses should be unusual because they are individual waivers of local legislation.[23] See *Norcross* v. *Board of Appeal of the Bldg. Dep't of Boston*,

---

[23]Although all variances are unusual forms of relief from zoning requirements, use variances should be particularly extraordinary because they inherently undermine the local zoning ordinance's division of uses. See M. Bobrowski, Massachusetts Land Use and Planning Law § 8.04, at 261 (2d ed. 2002) ("Use variances . . . are greatly disfavored"). General Laws c. 40A, § 10, bars zoning variances for nonconforming uses unless specifically authorized by the local zoning ordinance. The city's zoning ordinance authorizes such use variances.

255 Mass. 177, 185 (1926) ("It is only in rare instances and under exceptional circumstances that relaxation of the general restrictions established by the statute ought to be permitted. The power granted is only for the relief of specific instances, peculiar in their nature").

Consequently, the same factors that counsel us to read the variance to be limited by the board's finding that the use of property would not change also lead us to conclude that nude dancing does not constitute an existing use within the scope of the variance. See *Mendes* v. *Board of Appeals of Barnstable, supra* at 531 ("It would be anomalous if a variance, by its nature sparingly granted, functioned as a launching pad for expansion as a nonconforming use"). In this case, the variance confines the property's future use to Oliver's past uses. As is particularly appropriate where the variance holder urges a broad reading of a use variance to support a nonconforming use, we strictly construe the limitation. On the record before us, prior to the 1996 variance, Oliver's had been used as a restaurant, bar, a function hall, and a venue for live entertainment (including solo musicians, rock and roll bands, and disc jockeys), but not as a venue for adult entertainment or nude dancing. Accordingly, we need not decide whether "adult entertainment" is within or outside the general category of "entertainment," as a strict reading of the variance permits only those forms of entertainment that Oliver's hosted prior to 1996.[24] Because the record is clear that Oliver's never presented nude dancing prior to 1996,

---

[24]Anticipating this conclusion, Mendoza argues that discerning prior uses would create a "proof nightmare" for courts and that "entertainment" should be given its ordinary expansive meaning. If the text being interpreted were a generally applicable local zoning ordinance or statute, we would agree. *Framingham Clinic, Inc.* v. *Zoning Bd. of Appeals of Framingham,* 382 Mass. 283, 290 (1981), citing *Kurz* v. *Board of Appeals of N. Reading,* 341 Mass. 110, 112-113 (1960) (in holding that ordinance's provision for "professional office" and "hospital" uses in business district includes abortion clinic, court stated: "In the absence of an express definition, the meaning of a word or phrase used in a local zoning *enactment* is a question of law . . . and is to be determined by the ordinary principles of statutory construction" [emphasis added]). In the context of use variances, we are confident that property owners will be able to defend zoning enforcement actions against them so long as they confine their uses to the variances' terms. We express no opinion on the proper interpretation of such a variance in circumstances involving a bona fide purchaser of property with no means of ascertaining the allowed uses speci-

we hold that such a use cannot be an "existing use" within the scope of this particular variance.

We affirm the judge's ruling that the existing variance does not permit nude dancing at Oliver's.

4. *Attorney's fees and costs under 42 U.S.C. § 1988.* Under 42 U.S.C. § 1988, State and Federal courts may award, in their discretion, a "reasonable attorney's fee" to prevailing parties in civil rights litigation.[25] "The purpose of [the statute] is to ensure 'effective access to the judicial process' for persons with civil rights grievances." *Hensley* v. *Eckerhart*, 461 U.S. 424, 429 (1983). See *Kadlick* v. *Department of Mental Health*, 431 Mass. 850, 852 (2000), and cases cited (purpose "is both to promote civil rights enforcement and to deter civil rights violators, by encouraging private lawsuits aimed against civil rights abuses").

After the judge issued his decision, Mendoza offered detailed filings supporting his claim for $219,340.48 in attorney's fees and costs. In a written memorandum, the judge analyzed the disposition of the case and awarded Mendoza $155,696 for attorney's fees and $2,361.48 for other expenses. Relying on *Farrar* v. *Hobby*, 506 U.S. 103 (1992), the judge found that Mendoza had "achieved substantial, substantive success entitling him to reasonable compensation for appropriate hours of legal services." In his computation of the award, the judge deducted from Mendoza's request by subtracting (1) time spent on chal-

fied in the property's recorded variance decision. Cf. *DiGiovanni* v. *Board of Appeals of Rockport*, 19 Mass. App. Ct. 339, 346-347 (1985).

[25]Among other causes of action, Mendoza's lawsuits challenging the city's ordinances and the denials of his applications for an adult entertainment license proceeded under 42 U.S.C. § 1983, for redress of constitutional violations. As we have explained, "[s]ection 1983 provides a Federal cause of action against every person who under the color of State law deprives another person of any rights, privileges, or immunities guaranteed by the Constitution or the laws of the United States. Section 1988 authorizes a court, in its discretion, to award reasonable attorney's fees to a prevailing party in any action to enforce a provision of § 1983." *Perini Corp.* v. *Commissioner of Revenue*, 419 Mass. 763, 772, cert. denied, 516 U.S. 822 (1995). See 42 U.S.C. § 1988 ("In any action or proceeding to enforce a provision of [§ 1983] of this title . . . the court, in its discretion, may allow the prevailing party . . . a reasonable attorney's fee as part of the costs"). These attorney's fees are in addition to the court's usual award of litigation costs. See Mass. R. Civ. P. 54 (d), as appearing in 382 Mass. 821 (1980) (costs "shall be allowed as of course to the prevailing party" in civil action).

lenging the city's public indecency ordinance because Mendoza prevailed in that aspect of the litigation solely on his State constitutional claim,[26] (2) time spent on Mendoza's rejected claim that the terms of the variance for Oliver's permitted adult entertainment, and (3) twenty hours from the seventy-six hours billed for the preparation of the filings related to the fee award because the full request was excessive for the work performed.

The city and licensing board argue that Mendoza is not a "prevailing party," and is thus not entitled to attorney's fees or costs under 42 U.S.C. § 1988. In support of their contention, they point out that Mendoza has not obtained the practical relief the lawsuits sought — the ability to present nude dancing at Oliver's. Mendoza asks us to affirm the judge's award of attorney's fees and costs because the judge was correct that he was the "prevailing party" in the litigation. Because Mendoza does not challenge the judge's calculation of the fee award, we confine our review to the threshold question whether Mendoza was a prevailing party.

"[T]o qualify as a prevailing party, a civil rights plaintiff must obtain at least some relief on the merits of his claim." *Farrar* v. *Hobby, supra* at 111. Second, the "plaintiff must obtain an enforceable judgment against the defendant from whom fees are sought." *Id.* Third, "[w]hatever relief the plaintiff secures must directly benefit him at the time of the judgment or settlement." *Id.* "In short, a plaintiff 'prevails' when actual relief on the merits of his claim materially alters the legal relationship between the parties by modifying the defendant's behavior in a way that directly benefits the plaintiff." *Id.* at 111-112.[27]

The lower court's judgments in this case invalidated all of

---

[26]The city does not contest the division between the time spent on State and Federal claims successfully pursued below.

[27]We note that this expression of the requirements of prevailing party status is somewhat less "generous" than the Supreme Court's earlier formulation. *Farrar* v. *Hobby,* 506 U.S. 103, 109 (1992). See *Hensley* v. *Eckerhart,* 461 U.S. 424, 433 (1983). Cf. *Draper* v. *Town Clerk of Greenfield,* 384 Mass. 444, 453 (1981), cert. denied sub nom. *Draper* v. *Prescott,* 456 U.S. 947 (1982), quoting *Nadeau* v. *Helgemoe,* 581 F.2d 275, 278-279 (1st Cir. 1978) ("plaintiffs are 'prevailing parties' for § 1988 fee purposes 'if they succeed on any significant issue in litigation which achieves some of the *benefit* the parties sought in bringing suit' " [emphasis added]).

the challenged adult entertainment ordinances and secured Mendoza an adult entertainment license for Oliver's from the licensing board under G. L. c. 140, § 183A. The city and licensing board concede that this relief allows Mendoza to satisfy the first requirement of "prevailing party" status because he has obtained "at least some relief on the merits of his claim." *Id.* at 111. In their argument that Mendoza is not a "prevailing party," they assert that the judgments do not constitute relief that modifies their behavior in a way that directly benefits Mendoza because the sole practical relief Mendoza sought was the ability to present nude dancing at Oliver's, relief that he failed to obtain due to the judge's interpretation of the zoning variance.

Notwithstanding the city's and licensing board's arguments to the contrary, the declaratory and equitable relief awarded in this case satisfies both the second and third requirements for Mendoza's "prevailing party" status, as both types of relief are "enforceable judgment[s]" against them that "directly benefit" Mendoza. *Id.* at 111. As the judge held, the judgments provide Mendoza substantive rights to prevent the city's enforcement of its invalidated ordinances against Oliver's. The judgments actively prevent the city and licensing board from pursuing unconstitutional courses of action, which they defended vigorously throughout the litigation. Because the city and licensing board are no longer able to enforce the adult entertainment ordinances or to deny Oliver's an adult entertainment license, Mendoza is now eligible to apply for a zoning variance that would permit nude dancing.

We conclude, therefore, that the judgments "materially alter[ed] the legal relationship between the parties . . . in a way that directly benefits the plaintiff." *Id.* at 111-112. This distinguishes the relief here from the type of relief that "could not in any way have benefited [a] plaintiff." *Rhodes* v. *Stewart*, 488 U.S. 1, 4 (1988) (where plaintiffs in challenge to prison policies no longer in prison, "case was moot before judgment issued, and the judgment therefore afforded the plaintiffs no relief whatsoever. . . . [I]n consequence [the plaintiffs are] not entitled to an award of attorney's fees"). See *Texas State Teachers Ass'n* v. *Garland Indep. Sch. Dist.*, 489 U.S. 782, 792 (1989). Nor is this a case where the plaintiff's lawsuit was a

mere "catalyst" for a voluntary change in the defendants' behavior, as the plaintiff secured enforceable "judgments on the merits" of his claims. *Buckhannon Bd. & Care Home, Inc.* v. *West Va. Dep't of Health & Human Resources,* 532 U.S. 598, 604-605 (2001). The trial judge correctly ruled that Mendoza was a "prevailing party" and thus qualified for a discretionary award of attorney's fees.

5. *Conclusion.* For these reasons, the judgments of the Superior Court are affirmed.[28]

*So ordered.*

---

[28]In his brief Mendoza requested appellate attorney's fees. See *Fabre* v. *Walton,* 441 Mass. 9, 11 (2004). He is entitled to those fees incurred in litigating the defense of his attorney's fee award under 42 U.S.C. § 1988. See *Ustrak* v. *Fairman,* 851 F.2d 983, 990 (7th Cir. 1988) ("as the prevailing party in the underlying civil rights action, the [plaintiff] is entitled to reimbursment of fees reasonably incurred, whether they are fees incurred in the original civil rights trial and appeal, fees incurred in proving those fees, or fees incurred in defending the district court's fee award"). The plaintiff may apply for such fees under the procedure established by *Fabre* v. *Walton, supra* at 10-11.